**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| JEREMY SMITH, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | Case No. _____ |
| v. | ) | |
| | ) | Jury Demand |
| SONIC AUTOMOTIVE, INC., and | ) | |
| SONIC AUTOMOTIVE OF NASHVILLE, | ) | |
| LLC, d/b/a BMW OF NASHVILLE | ) | |
| | ) | |
|     Defendants. | ) | |

## COMPLAINT

Comes the Plaintiff, Jeremy Smith, and for cause of action against Defendants Sonic Automotive Inc., and Sonic Automotive of Nashville, LLC, d/b/a BMW of Nashville, states as follows:

## I. PRELIMINARY STATEMENT

1. Plaintiff, Jeremy Smith ("Plaintiff" or "Smith"), brings this action against Defendants Sonic Automotive, Inc. ("Sonic") and Sonic Automotive of Nashville, LLC, d/b/a BMW of Nashville ("BMW" or "BMW of Nashville")(collectively "Defendants") for violations of the Americans with Disabilities Act ("ADA") as amended by the ADA Amendments Act ("ADAAA"), 42 U.S.C. §§12101 to 12213 (collectively, the "ADA").

2. While employed as a Finance Manager at the BMW of Nashville location, a dealership owned and operated by Sonic, Smith – who has a prosthetic eye, facial paralysis, and hearing loss – was subjected to a relentless pattern of mockery and abuse by his direct supervisors and co-workers because of his disabilities. Management not only participated in this conduct, but encouraged others to follow suit, creating a hostile workplace culture steeped in cruelty and

ridicule of Smith's disabilities.  Management at Sonic and BMW of Nashville failed to take any meaningful action to stop the harassment or timely accommodate his known impairments, or to prevent retaliation against Smith for reporting the abuse and harassment.

3.      Instead of providing reasonable accommodations, such as a quieter and more private workspace to help him perform his job effectively, Defendants' management repeatedly denied Smith's requests while granting offices to less tenured, non-disabled employees.  When Smith formally complained to Sonics' executive leadership about the hostile work environment he experienced on an almost daily basis, he was suspended shortly thereafter and subsequently terminated based on false, pretextual allegations.

4.      This lawsuit seeks to hold Defendants accountable for their discriminatory conduct, hostile work environment, and unlawful retaliation under the ADA that resulted in Smith's financial ruin and extreme hardships as well as the uprooting of his family, causing severe mental, emotional, and economic damages.

## II.  JURISDICTION AND VENUE

5.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. §1331, as the Plaintiff's claims arise under the laws of the United States, specifically the ADA, codified at 42 U.S.C. §§12101, *et seq*.  The ADA is a federal statute that provides comprehensive civil rights protections to individuals with disabilities, and the Plaintiff's claims are predicated on violations of these federal rights.  Therefore, this Court is the appropriate forum for adjudicating the Plaintiff's claims under the ADA.

6.      Venue is proper in the Middle District of Tennessee under 28 U.S.C. §1391 because the events forming the basis of this suit occurred in this district.

2

### III. **CONDITIONS PRECEDENT**

7.     On June 21, 2024, Plaintiff timely filed a charge of disability discrimination and retaliation with the Equal Employment Opportunity Commission (EEOC) against Sonic Automotive, Inc., d/b/a BMW of Nashville.

8.     Representatives of Sonic Automotive of Nashville, LLC, d/b/a BMW of Nashville, received notice of the filing of Plaintiff's charge shortly after it was filed.

9.     On February 3, 2025, representatives of Sonic Automotive of Nashville, LLC, d/b/a BMW of Nashville, attended an EEOC mediation session conducted by EEOC mediator Juan Ibarra.

10.    Sonic Automotive of Nashville, LLC, d/b/a BMW of Nashville, filed a Response to the Plaintiff's Charge on April 16, 2025 in their capacity as "Respondent."

11.    An Amended Charge designating Sonic Automotive of Nashville, LLC, d/b/a BMW of Nashville as an additional Respondent was filed on May 13, 2025.

12.    On or about May 23, 2025, the EEOC issued Plaintiff a Notice of Right to Sue. This Complaint has been filed within 90 days of receipt of that notice, and Plaintiff has fully complied with all prerequisites to jurisdiction in this Court under the ADA.

### IV. **PARTIES**

13.    Plaintiff Jeremy Smith is an adult resident of Maury County, Tennessee who was employed by Sonic at its BMW of Nashville dealership located in Cool Springs in Williamson County Tennessee as a Finance Manager from January 19, 2023, until his termination on or about March 25, 2024.

14.    Defendant Sonic is incorporated in the state of Delaware, and its corporate headquarters is located at 4401 Colwick Road, Charlotte, North Carolina 28211. Sonic is a Fortune

500 company and one of the largest automotive retailers in the United States, operating over 100 dealerships across 14 states, representing approximately 25 different automotive brands, with a focus on luxury and import brands.

15.     Defendant BMW of Nashville is a Tennessee limited liability company that shares its principal place of business with Sonic at 4401 Colwick Road, Charlotte, North Carolina 28211, and is a wholly owned subsidiary of Sonic.

16.     B MW of Nashville operates its main dealership in Cool Springs at 1568 Mallory Lane, Brentwood, Tennessee, and a BMW Certified Pre-Owned dealership at 4040 Armory Oaks Drive, Nashville, Tennessee, that focuses on pre-owned vehicles.

## V.  <u>FACTS</u>

### A.  Smith's Disabilities and Physical Impairments

17.     When Smith was 2 years old, he was hit in the eye with a seesaw on a church playground, which resulted in his right eye being surgically removed at 8 years of age.  An ocular prosthesis, or a "glass eye," was implanted after he lost his natural eye.  Smith also has facial paralysis because of a facial nerve transection injury that occurred during surgery to remove a benign tumor when he was 6 months old, resulting in the loss of 50% of his hearing in his right ear.

18.     Because of this playground injury and the paralysis he suffered during the surgery as an infant, Smith's right eye will not shut or blink, and he cannot fully smile.  As a result, his face appears "frozen" on the right side and looks unnatural because it will not move in tandem with the left side of his face when he smiles, laughs or talks.

### B.  BMW of Nashville's Discrimination, Harassment and Retaliation Against Smith

19.     Smith was hired to work as a Finance Manager at BMW of Nashville at its

4

dealership located in Cool Springs on January 19, 2023.

20.     Almost as soon as he began working at the BMW dealership, certain co-employees, encouraged by the similar conduct of dealership management, began making inappropriate comments and jokes, and laughing about the appearance of Smith's face and eye.

21.     John McClarty was the General Manager when Smith first started working at the BMW dealership.  Although McClarty was not one of the main instigators, he did nothing to stop other employees at the dealership from making fun of Smith's facial deformities, which effectively served as encouragement and consent for them to humiliate and belittle Smith at will without fear of discipline.

22.     This encouragement is illustrated by BMW managements' treatment of a friend of Smith's named James Bunn who was hired after Smith recommended him for a Finance Manager position at the BMW dealership.

23.     On his first or second day on the job Bunn witnessed McClarty, along with his General Sales Manager, Kamel Tejeda, and Sales Manager, Cody Sumner, ridicule and making fun of Smith's facial deformities and eye – as well as Smith's daughter's eye[1] – prompting Bunn to call them out for belittling Smith in a group text which included dealership management and all the Finance Managers.

24.     Approximately twenty minutes later, McClarty called Bunn and fired him after his first full day on the job because he dared confront management about their treatment of Smith.

25.     In the days that followed, management at the BMW dealership openly laughed about firing Bunn after only one full day on the job which had the dual effect of signaling to Smith's co-employees what would happen to them if they dared to confront management about

---

[1]  Smith's daughter was born prematurely with a condition called "Hydrops Fetalis" which, among other serious medical complications, caused ptosis of her right eye.

5

their mistreatment of Smith, while simultaneously encouraging others to "pile on" and join in ridiculing Smith.

26.     While McClarty was General Manager at the BMW dealership, Tejeda and Sumner were the primary ringleaders in harassing and ridiculing Smith; McClarty did nothing to stop them, which essentially sanctioned their misconduct and mistreatment of Smith and encouraged others to do the same.

### C. Tejeda's and Sumner's Discriminatory and Retaliatory Misconduct

27.     On September 1, 2023, McClarty was promoted to head of Sonic's Tactical Fleet, which Sonic claims is "the largest and highest quality exotic and luxury car inventory in the country," and Tejeda was elevated to General Manager of the BMW dealership to take his place. Even though he was not officially bestowed the title, Sumner effectively became the acting General Sales Manager, and Tejeda's second-in-command.

28.     With Tejeda and Sumner now running the BMW dealership, the derision and humiliation of Smith's facial paralysis and appearance increased to the point it became a nearly daily occurrence.

29.     Tejeda and Sumner not only encouraged others to humiliate Smith, they personally engaged in publicly mocking and belittling his facial deformities and disabilities.

30.     Following his promotion, Tejeda repeatedly made inappropriate jokes about Smith's glass eye and facial paralysis in front of Smith's co-workers and dealership customers.

31.     By way of one example only, Tejeda often made embarrassing comments such as "use your good eye to make sure you do their deals correctly" in front of Smith's co-workers and customers in order to humiliate and embarrass Smith.

32.     Sumner, the de facto General Sales Manager, joined in the ridicule, aping Tejeda's

insults in front of co-workers and customers.

33.     Tejeda's and Sumner's inappropriate and demeaning comments about Smith's facial disfigurement and glass eye fueled additional taunting by the Salespeople, Sales Managers, and Finance Managers, which became a near daily occurrence at BMW of Nashville.

34.     Tejeda and Sumner either directly engaged in, or intentionally encouraged others at the BMW dealership to engage in demeaning, belittling and ridiculing Smith in the following non-exclusive ways:

- Throwing fake plastic eyeballs at Smith while making demeaning comments such as "here, maybe this will help you see better" while Smith was trying to work at the sales tower – which is out in the open – in plain sight of co-workers and customers;

- Constantly making insulting and dispiriting comments to Smith such as "how does it feel to have a face like that?"

- Sending emoji faces to Smith such as the "winking emoji" because it represented Smith with only one eye, and the "funny face" emoji because it represented Smith's frozen expression on the right side of his face due to his severed facial nerve; and

- Posting grotesque caricatures of Smith with only one eye at the sales tower for the entire dealership staff to see, as well as anyone else who happened to walk by, such as customers.

35.     Attached hereto as **Exhibit A** is a copy of a "funny face" emoji that Matt Gleichman, a Sales Manager at the BMW dealership, sent to Smith and copied others who worked at the dealership.

36.     With the participation and encouragement of Tejeda and Sumner, some of the most hurtful and cruel comments at the BMW dealership were directed at Smith's immediate family members in order to magnify his humiliation.

37.     The oldest of Smith's daughters was born prematurely with a life-threatening condition called "hydrops fetalis," which occurs when large amounts of fluid builds up in a baby's tissues and organs, causing severe swelling which overwhelms the infant's systems.  The effects

7

of the hydrops fetalis caused Smith's daughter to develop bronchopulmonary dysplasia, pleural effusions, and pulmonary stenosis. Smith's daughter also developed ptosis of her right eye – which is the drooping and swelling of the eyelid – which can only be corrected surgically.

38.     One day Smith's wife brought their daughters to the BMW dealership to show them where their daddy worked. After meeting Smith's wife and daughters, and while standing on the showroom floor within earshot of numerous others standing around, Tejeda belittled Smith's daughter with ptosis of her right eye saying "I could tell she was your daughter, she has the same eye as you."

39.     Tejeda's vicious comments gave other dealership employees license to follow his lead, and they often snickered and made hateful jokes about the Smith family's "standard issue eyes," and similar derisive statements.

40.      After Smith's dealership co-workers saw his wife, they commented on more than one occasion in front of others that "she shouldn't be married to you and f**king you," referring to Smith's facial disfigurement.

41.     Emboldened and encouraged by the vile comments made by BMW of Nashville's management staff, on another occasion a male employee told Smith that "I met your wife in Franklin and f**ked her" in front of a dealership Sales Manager.

42.     Instead of disciplining employees for making these vile and disgusting comments about Smith's daughter and wife, or putting a stop to it, Tejeda and Sumner laughed when others made those comments.

43.     Because Smith was the highest overall performing Finance Manager throughout his employment at the BMW dealership, Tejeda and Sumner could not fire him for a legitimate, merit-based reason, so they worked together to make his work-life as miserable as humanly.

44.     In an effort to force Smith out, Tejeda and Sumner engaged in a continuous and escalating pattern of intentional and outrageous conduct designed to humiliate, degrade, and cause severe emotional distress to Smith.

45.     Tejeda and Sumner not only conspired to subject Smith to intolerable mental and emotional derision, bullying, ridicule and humiliation, they imposed as many physical hardships on him as they could in light of his disabilities.

46.     Despite his documented hearing loss and monocular vision, during most of Smith's employment Tejeda and Sumner made Smith work at the "sales tower," which was an open area of the dealership where three to four Sales Managers and several Finance Managers worked, for no good reason.

47.     The sales tower was noisy and chaotic, with sales people coming and going, and dealership employees laughing and talking.

48.     The Finance Manager's job is tedious and involves much paperwork, requiring careful attention to detail, and any mistake means having to start over.  Tejeda and Sumner forced Smith to work at the sales tower knowing that Smith's hearing loss and monocular vision made the loud, open sales tower an especially difficult place for him to work.

49.     Tejeda and Sumner denied Smith's repeated requests to work out of empty offices that were available without giving a valid reason, and often vaguely responded that those offices were "reserved."

50.     When Finance Managers Payton Jett and Van Le were hired they were each given private offices, even though Smith had worked at the BMW dealership much longer and was the most productive Finance Manager.

51.     Tejeda and Sumner targeted Smith in other ways, repeatedly singling him out and

treating him in a starkly different manner than other employees.

52.     For example, on several occasions Tejeda and Sumner suspended Smith, took him out of sales rotation, or threatened him with firing for failing to get finance deals "funded" by the banks quickly enough.

53.     Other Finance Managers who also failed to get finance deals "funded" by the banks quickly enough in the very same month as Smith were not suspended, taken off sales rotation, or threatened with discharge.

54.     Chris Wojner, a Finance Manager at the BMW dealership, failed to get finance deals funded quickly enough the same month as Smith in May of 2023, but Tejeda suspended Smith for four days and told Smith he would let him know if he had a job after his suspension, while Wojner received no suspension at all.

55.     Tejeda and Sumner also instructed other BMW dealership employees to comb through Smith's paperwork in search of mistakes so that they could fire him.

56.     Tejeda and Sumner had Kendra "Kandy" Blain, the dealership controller, go through Smith's deals for several hours while Smith was travelling out of state to be with his daughter who was hospitalized in Wisconsin with a very serious and potentially life-threatening illness, looking for something they could fire him for.

57.     This was not the only time Tejeda and Sumner asked dealership employees to look for reasons to fire Smith.

### D.  Smith Reports the Disability Discrimination and Harassment

58.     By January of 2024 the constant drum beat of insults and cruelty toward Plaintiff and his family, and non-stop harassment, had such a devastating effect on Plaintiffs' self-esteem and physical and emotional well-being that he began having suicidal thoughts.

59.    In January of 2024 Smith decided to report Tejeda's and Sumner's behavior to Sonic's upper level management in hopes that store management would be disciplined appropriately and that Sonic would protect Smith from further taunting and humiliation.

60.    On January 12, 2024, Smith sent a letter to upper management, including the President of Sonic, Jeff Dyke, the majority shareholder, Brian Scott Smith, and Kevin Gaither, the Regional VP over the BMW of Nashville dealership, and several others, exposing dealership management and dealership employees for their longstanding discriminatory and harassing treatment of him.

61.    A true and accurate copy of Smith's letter to Sonic's upper management is attached hereto as **Exhibit B**.

62.    After Smith sent his complaint letter to Sonic's upper management, Smith and his wife met with Jennifer Lowe, Sonic's Regional HR Representative, and Kendra "Kandy" Blain, the dealership controller, on January 22, 2024, to take Smith's statement of events.

63.    Jennifer Lowe then began investigating Smith's complaints, which included interviewing and taking written statements from Smith's co-workers at BMW of Nashville.

64.    The interviews and written statements Jennifer Lowe took from Smith's co-workers at BMW of Nashville confirmed the accuracy and validity of Smith's complaints of discrimination and harassment.

65.    On February 13, 2023, Smith once again met with Ms. Lowe, who was joined by Kevin Gaither, Sonic's Regional VP, at the BMW of Nashville dealership to discuss the results of their investigation.

66.    During this meeting, Gaither acknowledged and apologized for Smith's mistreatment, asked Smith why he had not come to Gaither instead of going to Sonic's upper

11

management, and what Smith wanted to accomplish by complaining about his mistreatment.

67.     When Smith responded that he felt that Tejeda, Sumner, and Matt Gleichman, a Sales Manager, should be fired, Gaither said something to the effect "you're asking me to terminate somebody that has been with our company…started as an LDP…worked their whole way up in the company, and you're asking me to terminate them.  Because that's what you said you wanted. You want me to terminate Cody. You want me to terminate Kamel, and throw away their careers with Sonic Automotive."

68.     Gaither stated to other BMW of Nashville team members that he was not going to fire Tejeda or Sumner who were largely to blame for creating and perpetuating the toxic work environment because he had too much invested in them as dealership managers.

69.     Not only did Sonic not fire Tejeda and Sumner, they were not demoted, suspended, have their pay docked, or disciplined in any meaningful way.

**E.  Sonic Doubles Down on the Harassment, Discrimination, and Retaliation**

70.     After Smith's meeting with Lowe and Gaither, Lowe scheduled a zoom meeting with Smith that was also attended by Evelyn Slaybaugh, Sonic's Director of National Payroll, for February 15, 2024.

71.     Based on Sonic's investigative findings, Smith believed that the purpose of the meeting Lowe scheduled was to inform him about the discipline Sonic was imposing on Tejeda, Sumner and others responsible for discriminating against him and harassing him because of his disabilities, and the steps Sonic was taking to prevent any further mistreatment.

72.     Lowe, acting on behalf of Sonic, did not set up this meeting for the purpose of informing Smith of the discipline imposed on those responsible for, or who participated in, his mistreatment, or to assure him he would be protected going forward.

12

73.     The intended purpose of this meeting was to present Smith with a Severance and Release Agreement to signal that he was not welcome at Sonic in retaliation for reporting the discrimination and harassment he suffered at the hands of dealership management to Sonic's upper brass.

74.     At the outset of this meeting, Lowe told Smith that "Kevin [Gaither] and I got the impression the other day that you are extremely unhappy, and you may be in a position where you'd like to leave employment but maybe not in a position financially to do so," and proceeded to present a Severance and Release Agreement to Smith releasing all his claims against Sonic.

75.     In its Severance and Release Agreement, Sonic offered Smith only $24,319.93 (reduced by applicable payroll withholding), in exchange for a waiver and full release of all claims against Sonic, along with a confidentiality clause which would prevent Smith from disclosing his mistreatment.

76.     Smith was a highly paid, successful Finance Manager who grossed well over $300,000.00 a year, and was the sole breadwinner for his family, so he declined Sonic's offer to resign and give up his high paying job.

77.     During this meeting, Lowe acknowledged that Kevin Gaither, Sonic's Regional VP, was aware of and authorized presentation of the Severance and Release Agreement to Smith.

78.     The Severance and Release Agreement Lowe presented to Smith was signed by Kevin Gaither as Regional Vice President on behalf of Sonic Automotive, Inc, which was identified as Smith's employer.

79.     A true and accurate copy of this Severance and Release Agreement that Sonic presented to Smith is attached hereto as **Exhibit C**.

### F.  Smith is Fired for Bogus, Pretextual Reasons

13

80.     On March 22, 2024, a few weeks after Smith rejected Sonic's Severance and Release Agreement, Kamel Tejeda, the BMW dealership's General Manager who Smith had reported to Sonic's upper management two months earlier for his outrageous and discriminatory conduct, called Smith and told him he was suspended without pay pending an investigation for "fraud," but refused to provide any details to Smith.

81.     On Monday March 25, 2024, Tejeda asked Smith to come to the dealership to meet with him the next morning at 9:00 a.m.

82.     When Smith arrived the next morning, Tejeda and Jennifer Lowe, Sonic's HR Representative, presented Smith with a separation notice firing him for allegedly "falsifying company records" and "violation of company standards of conduct."

83.     When Smith pressed for details, Tejeda claimed that Smith asked a customer to purchase a PermaPlate windshield protection plan in order to make a commission and falsely told the customer that he could cancel it after thirty (30) days.

84.     Smith did not tell the customer he would make a commission on the sale of the PermaPlate product, or that the customer could cancel it after thirty (30) days.

85.     Smith's discharge was based on bogus reasons that were entirely made up by Tejeda, Sumner, and Gaither in furtherance of their pattern of discrimination based on Smith's disabilities and in retaliation for Smith's protected activity.

86.     During their alleged "investigation," neither Tejeda, Sumner, or Gaither – nor anyone else acting on behalf of Defendants – bothered to ask Smith for his version of events, even though they knew that the PermaPlate deal was so small it was extremely unlikely Smith could benefit financially from it, and that it was in fact more likely to lower his compensation.

87.     Cody Sumner, who took the customer's phone call to cancel the PermaPlate

product, told the customer that Sonic would refund the customer's purchase price of $1,777.00, provided the customer would sign a statement which supposedly supported their firing of Smith.

**G. Defendants' Constitute a Single Integrated Enterprise, and Are Joint Employers**

88.   "Sonic Automotive, Inc., d/b/a BMW of Nashville," was listed as Smith's employer in the Severance and Release Agreement that Jennifer Lowe, Sonic's Regional HR representative, presented to Smith which is attached hereto as **Exhibit C**.

89.   "Sonic Automotive of Nashville, LLC, d/b/a BMW of Nashville," was identified as Smith's employer in the response it filed to Smith's EEOC Charge on April 16, 2025.

90.   Sonic Automotive Inc. established workplace policies applicable to Sonic Automotive of Nashville, LLC, d/b/a BMW of Nashville.

91.   Sonic Automotive Inc. established the policies set forth in the Teammate Handbook applicable to Smith and other employees of Sonic Automotive of Nashville, LLC, d/b/a BMW of Nashville.

92.   Sonic Automotive Inc. established the compensation plans for Smith and other employees of Sonic Automotive of Nashville, LLC, d/b/a BMW of Nashville, throughout Smith's employment.

93.   Sonic Automotive Inc. handled payroll processing and benefits administration functions for employees of Sonic Automotive of Nashville, LLC, d/b/a BMW of Nashville, throughout Smith's employment.

94.   Sonic Automotive Inc. established job descriptions and job requirements for Smith and other employees of Sonic Automotive of Nashville, LLC, d/b/a BMW of Nashville, throughout Smith's employment.

95.   Sonic Automotive Inc. established disciplinary policies applicable to employees of

Sonic Automotive of Nashville, LLC, d/b/a BMW of Nashville, throughout Smith's employment.

96.     Employees of Sonic Automotive Inc., such as Kevin Gaither, Sonic's Regional VP, hired and fired employees of Sonic Automotive of Nashville, LLC, d/b/a BMW of Nashville, and/or provided input about the hiring and firing of employees to BMW of Nashville, and/or had the right to hire and fire BMW dealership employees.

97.     Kevin Gaither provided input into and approved the firing of Smith.

98.     Sonic Automotive Inc. handled human resources administration functions for employees of Sonic Automotive of Nashville, LLC, d/b/a BMW of Nashville throughout Smith's employment.

99.     Sonic Automotive Inc. exercised control over the working conditions of Smith and other employees of Sonic Automotive of Nashville, LLC, d/b/a BMW of Nashville throughout Smith's employment.

100.    Defendants Sonic Automotive, Inc., and Sonic Automotive of Nashville, LLC, d/b/a BMW of Nashville, are integrated enterprises that share common operating systems with an interrelation of operations.

101.    Defendants Sonic Automotive, Inc., and Sonic Automotive of Nashville, LLC, d/b/a BMW of Nashville, were joint employers of Smith.

### H.  Defendants Destroyed Smith's Reputation and Career, and Inflicted Severe Financial Hardships on Smith and his Family

102.    Despite his physical impairments, Smith excelled professionally and was consistently the top-producing Finance Manager at BMW of Nashville during his tenure, earning in excess of $300,000.00 annually.

103.    Smith had worked successfully in the retail automotive industry since 2013, but through their malicious actions Defendants irreparably damaged Smith's good reputation and

career in the automotive industry along with his family's financial stability.

104.    After his firing, Smith applied for jobs at six area dealerships, none of which would even interview him in spite of his experience, impressive resume and history of excellent performance.

105.    An employee at one of the dealerships where he applied informed Smith that he heard that Smith was fired for stealing money and forging customer's names on warranties.

106.    Since his firing, Smith has taken jobs cutting grass with a landscape company, waiting tables at a restaurant, and trying to sell insurance in an unsuccessful effort to make ends meet.

107.    Since Tejeda and Sumner orchestrated Smith's firing from the BMW dealership, Smith has been unable to support his family financially, and his wife and two daughters were forced to leave Tennessee and move in with his wife's parents in Wisconsin.

108.    The shame, humiliation and worry Smith felt as a result of being unable to support his family financially his physical and mental suffering.

109.    Smith has also been forced to sell assets at less than market value, and at a significant loss, in an effort to support himself and his family.

## I.  Smith Suffered Severe Physical and Emotional Injuries and became Suicidal as a Result of Defendants' Actions

110.    Smith suffered severe emotional distress, including but not limited to humiliation, depression, worry, anxiety, agitation, low self-esteem, feelings of helplessness, insomnia, and nightmares, both during and following his employment as a direct and proximate result of Defendants' inexcusable conduct and mistreatment of him.

111.    Plaintiff continues to suffer ongoing emotional harm.

112.    Tejeda's and Sumner's atrocious conduct and the severe and near constant

emotional trauma and derision they inflicted on Smith on a daily basis negatively affected his physical health and well-being, causing headaches, stomachaches, loss of appetite and nausea.

113.    The relentless mistreatment and psychological damage that Tejeda, Sumner and others inflicted on Smith escalated to such a degree that Smith contemplated suicide, causing him to seek counselling for emotional support.

## VI.    CAUSES OF ACTION

### COUNT I – DISABILITY DISCRIMINATION UNDER THE ADA

114.    Plaintiff incorporates by reference all preceding paragraphs.

115.    Plaintiff is an individual with disabilities within the meaning of the ADA, 42 U.S.C. §12102(1), including monocular vision requiring a prosthetic eye, facial paralysis due to a nerve transection injury, and hearing loss, substantially limiting major life activities including seeing, hearing, and communicating.

116.    Plaintiff was a qualified individual under the ADA, capable of performing all essential functions of his Finance Manager position at BMW of Nashville, as evidenced by his exemplary performance throughout his employment.

117.    Defendants discriminated against Plaintiff on the basis of his disabilities by subjecting him to disparate treatment, including regularly ridiculing him, encouraging hostile workplace harassment, imposing disciplinary actions without basis, refusing accommodations afforded to non-disabled, less-tenured employees, and ultimately terminating his employment for pretextual reasons.

118.    Defendants' conduct constitutes unlawful disability discrimination under the ADA, specifically violating 42 U.S.C. §12112(a).

### COUNT II – FAILURE TO ACCOMMODATE UNDER THE ADA

119. Plaintiff incorporates by reference all preceding paragraphs.

120. Plaintiff repeatedly requested reasonable accommodations from Defendants, specifically assignment to a quieter, private workspace to effectively perform the detailed tasks required by his position, due to his hearing loss and monocular vision.

121. Despite available private offices and provision of such accommodations to non-disabled, less experienced employees, Defendants consistently refused Plaintiff's requests without justification, exacerbating the hardships posed by his impairments.

122. Defendants' deliberate refusal to accommodate Plaintiff constitutes unlawful failure to accommodate under the ADA, specifically violating 42 U.S.C. §12112(b)(5)(A).

## COUNT III – HARASSMENT UNDER THE ADA

123. Plaintiff incorporates by reference all preceding paragraphs.

124. Throughout Plaintiff's employment, Defendants, through managerial employees Tejeda, Sumner, and others, engaged in severe, pervasive, and persistent harassment directed at Plaintiff's disabilities, including humiliating public comments, ridicule involving physical mockery and offensive gestures, displaying grotesque caricatures, targeting Plaintiff's family with offensive remarks, and pressuring Plaintiff to resign after crediting his complaints.

125. Defendants' management-level staff and executives had actual knowledge of the harassment Plaintiff was experiencing because those management employees were responsible for harassing Plaintiff and encouraging others to do likewise, and because of Plaintiff's complaint to upper management, HR representatives, and senior executives exposing the harassment, yet failed to take any meaningful remedial action to stop or prevent further harassment or retaliation.

19

126.    Defendants' actions and omissions constitute unlawful disability harassment under the ADA, specifically violating 42 U.S.C. §12112(a), creating a hostile work environment that altered the conditions of Plaintiff's employment.

## COUNT IV – RETALIATION UNDER THE ADA

127.    Plaintiff incorporates by reference all preceding paragraphs.

128.    Plaintiff engaged in protected activity under the ADA, specifically reporting disability-based discrimination and harassment to Defendants' senior management in January 2024.

129.    Shortly after Plaintiff engaged in protected activity, Defendants retaliated by placing Plaintiff on leave, then presenting him with a Severance and Release Agreement after crediting his complaints of discrimination and harassment, and ultimately by terminating his employment under false and pretextual allegations.

130.    Defendants' retaliatory actions that occurred shortly after Plaintiff's protected activities were causally related thereto.

131.    Defendants' articulated reasons for Plaintiff's termination were knowingly false and pretextual, further evidencing their retaliatory intent.

132.    Defendants' conduct constitutes unlawful retaliation under the ADA, specifically violating 42 U.S.C. §12203(a).

## VII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment against Defendants and grant the following relief:

A.    Back pay, including lost wages, salary, employment benefits, and other compensation denied or lost;

20

B.     Front pay, including future lost earnings, benefits, and employment opportunities;

C.     Compensatory damages for emotional distress, humiliation, anxiety, and related psychological harm;

D.     Punitive damages sufficient to punish Defendants and deter similar misconduct;

E.     Reasonable attorneys' fees and costs pursuant to 42 U.S.C. §12205;

F.     Pre- and post-judgment interest as allowed by law; and

G.     Such other and further relief as the Court may deem just and proper.

H.     A jury to try this cause.

Respectfully submitted,

DICKINSON WRIGHT PLLC

*/s/ M. Reid Estes, Jr.*
M. Reid Estes, Jr., TN Bar # 9043
Fifth Third Center
424 Church Street, Suite 800
Nashville, TN 37219-2392
Tel.:  615.244.6538
restes@dickinsonwright.com

*Attorneys for Plaintiff*

21